IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

PAM BAGGETT                                                                PLAINTIFF

v.                              No. 4:12CV00526 JLH

BRIAN BARNETT, individually and in his
official capacity; UNIVERSITY OF ARKANSAS
FOR MEDICAL SCIENCES by and through the
BOARD OF TRUSTEES OF THE UNIVERSITY
OF ARKANSAS; and JOHN ED ANTHONY,
CARL JOHNSON, JANE ROGERS, SAM HILBURN,
MIKE AKIN, JIM VON GREMP, JOHN TYSON,
BEN HYNEMAN, DAVID PRYOR, and
MARK WALDRIP, in their official capacities as
members of the Board of Trustees of the University
of Arkansas                                                              DEFENDANTS

## OPINION AND ORDER

Pam Baggett brings this action against Brian Barnett, individually and in his official capacity

as the administrator of the Department of Internal Medicine at the University of Arkansas for Medical

Sciences, and against the University of Arkansas for Medical Sciences by and through individual

members of the Board of Trustees of the University of Arkansas in their official capacities. The

defendants have filed a motion for summary judgment. For the reasons stated below, the motion is

granted.

## I.

The Department of Internal Medicine encompasses nine academic divisions and one

administrative division. Baggett became employed as a bookkeeper for the administrative division

in November 1981. Over the years Baggett took on greater responsibilities. By 2003, Baggett held

the position of associate administrator for accounting, one of three department-level associate

administrator positions. Baggett reported directly to the administrator of the Department of Internal

Medicine, and in turn, had two employees who reported to her—Judy Whaley, a grants administrator, and Joyce Hummel, a clinical trials accountant.  The Department of Internal Medicine operated at a deficit every year that Baggett was employed there.  The continual charge from Debra Fiser, Dean of the College of Medicine, to Dr. James Marsh, the chairman of the Department of Internal Medicine, was to decrease the deficit by allowing certain positions that come open to go unfilled, to cut unnecessary faculty travel, to improve billing processes, and to increase income.  Document #21-1 at dep. p. 53; Document #38 at 8.

In July 2003, Brent McKay was the administrator of the Department of Internal Medicine.  At that time, Baggett asked McKay to place her on an 80%-time work schedule to allow her to deal with certain medical issues.  Document #21-1 at 34; *id.* at dep. p. 29.  McKay granted Baggett's request to go to a part-time work schedule as of August 1, 2003.  Document #21-3 at 27.  McKay reduced Baggett's yearly salary by 20% to $40,394.00.  Document #21-1 at 35.  However, McKay chose to keep Baggett listed in the payroll and benefits system as a full-time employee.  Baggett asked McKay to change her full-time listing to an 80%-time listing several times, and McKay always refused.  Document #21-1 at dep. p. 30.  McKay told Baggett not to worry about it  and that if it ever became an issue, he would take care of it.  McKay also told her that, as far as he was concerned, she was working from home one day a week.  *Id.*  Baggett had home access to every system she used at work, and she told McKay that she was working at home one day a week and would continue to do so as long as McKay had her listed in the system at 100% time.  Document #21-1 at dep. p. 30.

Baggett's department-level administrative responsibilities included, in part, notifying division-level administrators of errors in requisitions that they submitted.  At McKay's direction, Baggett's communications with division-level administrators was at times ungracious, to-the-point, and

impossible to misunderstand.  Document #37 at 23 ¶ 55 resp.  Baggett was known for her abrasive and demanding personality by those who worked with her.  *See, e.g.*, Documents #21-4 at 1 ¶ 2; #21-5 at 1 ¶ 2; #21-6 at 1 ¶¶ 2, 3; #21-7 at 1 ¶ 2.  Most division-level administrators did not care to hear from Baggett because it meant either that they or their staff would likely have more work to do as a result of their error or failure to meet a deadline.  Document #37 at 23 ¶ 55 resp.  McKay instructed Baggett to remove erroneous requisitions from the accounting office's waiting queue until division-level administrators corrected their mistakes and resubmitted the requisitions.  *Id.* at 25 ¶ 58 resp.  For a while, McKay instructed Baggett to remove the requisitions from the queue and send them back to the division-level administrators without explanation, in hope that they would discover their errors on their own.  *Id.* at 26 ¶ 58 resp.  This policy was met with resistance from division-level administrators, so McKay instructed Baggett to return to removing the requisitions from the queue and pointing out errors for correction.  *Id.*

McKay became ill, and he died in April 2010.  Baggett told Susan Leon, an employee of the Dean's office, of her work arrangement under McKay and asked her for advice regarding what needed to be done.  Accruing full-time leave and benefits while working part-time was contrary to UAMS policy.  *See* Document #21-3 at 11-17.  Baggett stated that even though she had been working full time she would be glad to pay back the value of 20% of the full-time benefits she had enjoyed for the previous seven years in order to clear her good name.  Document #21-1 at dep. p. 32.  Brian Barnett was hired as McKay's replacement in September 2010.  On November 3, 2010, Barnett became aware that Baggett had been driving into work only four days a week while receiving full time leave and benefits for the previous seven years.  Document #21-3 at 6.  Barnett discussed the situation with Steve Wood, the director of human resources for the College of Medicine, and they came up with two

options: either Baggett could take a 20% decrease in the payroll system and a 20% reduction in both salary and benefits to continue her work arrangement under McKay or she could immediately return to driving into work five days a week. Document # 21-3 at 7. Baggett chose to return to driving into work five days a week.

Barnett advised Baggett that the department would not be able to increase her salary immediately and that she would need to come up with a job description for her position to be reclassified at a higher salary. Document #21-3 at 7. On November 4, 2010, Baggett provided Barnett with an job description, which Barnett found acceptable. *Id.* On November 18, 2010, Barnett met with Baggett again. During that meeting they discussed Baggett's need to understand and assist in the analysis and interpretation of financial reports, her need to adopt an improved demeanor and a customer-service attitude, and her need to get along well with Suzanne Holland, the department-level associate administrator of human resources. *Id.* Barnett told Baggett that he envisioned her serving as the chief financial officer for the department and taking on certain duties that had traditionally been the responsibility of the department administrator. Document #21-1 at dep. p. 38. Baggett stated that she would be glad to learn any new skills that were necessary to fulfill the responsibilities of the position.

Barnett later received news that only four days after this conversation, Baggett had offended a programmer who was working to get her access to the new reports. Document # 23-1 at 7. Around this time, Barnett expressed concern about Baggett's ability to perform her assigned duties to Audrey Bradley, the Campus Employee Relations Manager. Document #21-3 at 1. Someone showed Baggett how to complete the reports that Barnett requested and where to obtain the necessary information. *Id.* at 7. Baggett took initiative in working on the reports, which she completed for Barnett's review.

4

*Id.* The reports were well done, and Barnett and Baggett discussed when the reports should be completed in the ordinary course of business. *Id.*

On December 2, 2010, Baggett completed her assigned reports without realizing that they needed to include two sources of revenue that had not yet posted. Later that day, Barnett called Baggett into his office, sharply reprimanded her, and gave her a verbal warning for her error, which he said fell short of "demonstrat[ing] the ability to review, analyze, and interpret the reports as written and expected in her job description." *Id.* at 7-8. Barnett informed Baggett that he "felt the magnitude and type of error demonstrated in the completion of an inaccurate report was enough of a concern in her ability to complete her job duties as agreed upon that [he] would proceed to a written warning with the next occurrence." *Id.* at 8.

On December 10, 2010, Baggett sent an email to Barnett to ask what was being done to restore her full-time salary. Barnett responded with the following message:

> Pam,
>
> We discussed that we would need an accurate job description to be able to address this, which you have now completed. We have agreed that the job description you provided is a reasonable expectation and is what is being performed. Currently the only mechanism that I am aware of for a pay raise is an out of cycle request based on a position reclassification. After reviewing the job description and comparing it to your current position as a project program manager I do not see that we have sufficient rationale to request an increase in position level and therefore any additional salary amount.
>
> This is my assessment, however if you wish you may request a review from HR as well. Let me know how you wish to proceed.

*Id.* at 10. Baggett responded with an email that stated, in pertinent part: "This is not acceptable. You can't expect me to work full-time for my part-time salary." *Id.* at 9. Baggett stated that she had written Dr. Marsh and that if nothing were done she would meet with Steve Wood, the human

resources manager for the College of Medicine.  Baggett stated, "If the Dean's office can't fix this, then I will go to Personnel and let whatever happens, happen."  *Id.*  Barnett interpreted Baggett's response as a request to appeal his assessment, and he forwarded their email exchange to Wood, Bradley, Dr. Marsh, and Holland.  *Id.*  On December 28, 2010, Barnett advised Norman Sward, the director of human resources, that his expertise would be required to determine what benefits expenses Baggett may owe to the department.  *Id.* at 27.  Baggett spoke to Bradley, Wood, and Dr. Marsh about the salary issue.  She also spoke to Dr. Marsh about her concern that Barnett was not teaching her the necessary skills to succeed in her position.  Document #21-1 at dep. pp. 43-47.

On February 17, 2011, Baggett sent an email to Barnett stating that her new duties as chief financial officer of the department "should be included in any position review that was presented" to human resources.  Document #36-5.  Barnett responded that Baggett had "only been asked to completed [sic] one new report per month," and that she had "been included in the requests for . . . HR to review [her] salary."  *Id.*

Barnett made various personnel changes during the spring of 2011.  First, Barnett did not hire a replacement for an Advance Practice Nurse position in the cardiology division that had come open in or about September 2010.  This position was eventually eliminated.  Barnett also identified an administrative assistant position in the rheumatology division whose primary duties involved medical transcription.  This position was transferred out of the Department of Internal Medicine into the hospital.  Finally, sometime in March 2011, Barnett hired Michael Legate as an administrator for the cardiology division at a salary of $64,000.00 per year.

On March 18, 2011, Baggett sent an email to Burnett, to which she attached a document that she created showing associate administrator salaries for the years 1998 through 2012.  Document

#21-3 at 32. Baggett's email stated that her salary was not equitable in light of the salaries of other department-level associate administrators, and she stated that this situation should be corrected by any means necessary. *Id.* Baggett claimed that her full-time salary should be paid at $66.995.00 per year, but she was only receiving $53,548.00 per year. Documents #21-1 at dep. pp. 50-51 and #36-6. Barnett, Bradley, and Holland met to discuss the issues raised by Baggett's email. Document #21-3 at 32. They "discussed if there was actually a need for [Baggett's] position." *Id.* at 33. They also discussed that Baggett was "argumentative and not able to run reports and does not respect Brian as the boss." *Id.* Barnett decided to terminate Baggett and to reassign her responsibilities to other positions. *Id.* On April 1, 2011, Bradley sent via email to Barnett a formal termination letter that was addressed, but not sent, to Baggett, dated March 31, 2011. *Id.* at 35. The letter had been approved by the UAMS Office of General Counsel that day. *Id.* Barnett discussed his decision to eliminate Baggett's position with Dr. Marsh and the Executive Committee, which consisted of the vice chair of research, the vice chair of education, and the chief of medical services at the hospital. Document #21-2 at dep. p. 62.

On April 6, 2011, Baggett spoke to Norman Sward and gave him a letter in which she stated that she would file a charge with the Equal Employment Opportunity Commission if her salary was not corrected. Document #21-1 at dep. pp. 47-49. According to Baggett, Sward told her, "This is an EEOC lawsuit waiting to happen, and I wouldn't blame you one bit if you filed a lawsuit. And I will take care of this. And it will be fixed and you will get your back pay."[1] Document #21-1 at dep.

---

[1] On April 10, 2011, Sward sent an email to Baggett that he copied to Barnett, Dr. Marsh, Bradley, Holland, Backus, and Mark Hagemeier, in which he stated his disappointment with an email Baggett had sent to Barnett and Dr. Marsh describing his April 6, 2011 meeting with her. Sward stated, in pertinent part:

[Y]our statements on our conversation last Wednesday are rather embellished: while

p. 47.  On April 8, 2011, Barnett and Wendy Backus (a Dean's office employee) met with Baggett. *Id.* at dep. p. 69.  Barnett informed Baggett that she would receive back pay to November 1, 2010, and that they were going to reduce her position to an 80% work schedule.  *Id.* at dep. pp. 69-70.  The new duties Barnett had given to her to fulfill her role as chief financial officer of the department were cancelled.  Baggett was not asked to pay back the value of any leave or benefits that she had received for the previous seven years.  *Id.* at dep. p. 32.  Baggett was happy with this arrangement.  *Id.* at 36; *id.* at dep. p. 70.

On April 27, 2011, Baggett received a check containing her back pay for the previous five months.  Document #38 at 13.  The next day, Barnett called Baggett into his office to meet with him and Backus.  In that meeting Barnett gave Baggett a letter dated April 28, 2010, which stated that her "employment in the Department of Internal Medicine will be terminated as of June 3, 2011 due to the consolidation of duties in response to continued financial difficulty and budget reductions."  Document #21-1 at 37.  Other than the termination date, this letter was identical to the letter dated March 31, 2010, which had been approved by the UAMS Office of General Counsel on April 1, 2010.  *Compare* Documents #21-1 at 37 and #21-3 at 36.  Later that day Baggett met with Sward.  Sward's meeting notes indicate that he "tried to 'open her parachutes,'" and they discussed her options, including filing a grievance, filing an EEOC charge "as a woman and over 40," seeing an attorney, negotiating for eight more months of employment in return for resigning without incident, and leveraging her nearly 30 years of employment and knowledge of UAMS accounting structures and systems to find other

---

> I agreed that the documents you showed me were supportive of your argument (80% salary and effort but 100% in SAP), I would have appreciated a more balanced version on the meeting that said a) we had met, b) I saw some merit in your assertions, and b) [sic] I agreed to talk with Brian about them.

Document #36-10.

projects to work on for eight months.  Document #36-9.  Barnett did not hire a replacement for Baggett, and the position she held as associate administrator of accounting was eliminated altogether. Document #21-1 at dep. p. 73.

On July 13, 2011, Baggett filed a charge of discrimination with the EEOC, claiming sex discrimination and retaliation.  Document #21-1 at 38.  The EEOC issued her a right-to-sue letter, and she subsequently filed this action, alleging claims for sex discrimination and retaliation under 42 U.S.C. § 1983; sex discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.; and a violation of the Equal Pay Act, 29 U.S.C. § 206(d)(1).

## II.

A court should enter summary judgment if the evidence demonstrates that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986).  The moving party bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986).  If the moving party meets this burden, the nonmoving party must respond by coming forward with specific facts establishing a genuine dispute for trial. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc).  In deciding a motion for summary judgment, a court views the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor.  *PHL Variable Ins. Co. v. Fulbright McNeill, Inc.*, 519 F.3d 825, 828 (8th Cir. 2008).  A genuine dispute exists only if the evidence is sufficient to allow a jury to return a verdict for the nonmoving party.  *Anderson*, 477 U.S. at 249, 106 S. Ct. at 2511.  When a nonmoving party cannot make a showing sufficient to establish

a necessary element of the case on which that party bears the burden of proof, the moving party is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 322-23, 106 S. Ct. at 2552.

### III.

As an initial matter, the parties agree that section 1983 official-capacity claims for money damages are barred by the State of Arkansas's Eleventh Amendment sovereign immunity. Baggett responds that her section 1983 official-capacity claims are only for injunctive relief and that she does not seek money damages or equitable front pay.

"[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71, 109 S. Ct. 2304, 2312, 105 L. Ed. 2d 45 (1989). "As such, it is no different from a suit against the State itself." *Id.* To prevail on her official capacity claims for equitable relief, Baggett must show that she was deprived of a federal right and that UAMS was the "moving force" behind that deprivation. *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S. Ct. 3099, 3105, 89 L. Ed. 2d 114 (1985). Baggett cannot show that she was deprived of a federal right, so the issue of whether UAMS was the "moving force" does not arise.

### A.     Sex-Discrimination Claims

Baggett has alleged claims under Title VII, section 1983, and the Equal Pay Act, arguing that the unequal wages she received and the elimination of her position constituted discrimination on the basis of sex. For her section 1983 claim, Baggett does not specify which constitutional right she claims the defendants violated, but this Court will infer that Baggett intended to claim a violation of her rights under the Equal Protection Clause. *Tipler v. Douglas Cnty., Neb.*, 482 F.3d 1023, 1027 (8th Cir. 2007) (stating that the "right to be free from gender discrimination is secured by the [E]qual

[P]rotection [C]lause of the Fourteenth Amendment."). Because the analysis is essentially the same for Title VII and § 1983 sex-based employment-discrimination claims brought under the Equal Protection Clause, the analysis will proceed under the Title VII framework. *Id.*; *see St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 n.1, 113 S. Ct. 2742, 2747 n.1, 125 L. Ed. 2d 407 (1993) (assuming that the *McDonnell Douglas* framework is fully applicable to section 1983 employment discrimination claims); *Briggs v. Anderson*, 796 F.2d 1009, 1021 (8th Cir. 1986) ("The inquiry into intentional discrimination is essentially the same for individual actions brought under §§ 1981 and 1983, and we will therefore confine the discussion to Title VII."); *Craik v. Minn. State Univ. Bd.*, 731 F.2d 465, 468 n.5 (8th Cir. 1984) ("The issue of discriminatory intent is common to analyses under the Fourteenth Amendment, § 1983, and Title VII."). Baggett's Title VII claims may survive the defendants' motion for summary judgment if she produces direct evidence of discrimination or shows that there is a genuine dispute for trial under the *McDonnell Douglas* burden-shifting framework. *Floyd-Gimon v. Univ. of Ark. for Med. Sciences ex rel. Bd. of Trs. of Univ. of Ark.*, 716 F.3d 1141, 1149 (8th Cir. 2013) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)).

Baggett argues that she has direct evidence of sex discrimination. She contends that Sward, the head of human resources, told her during their April 28, 2011 meeting that she should sue and that Sward's statement is recounted in his meeting notes. Sward's meeting notes do not indicate that Sward told her that she should sue. Rather, those notes indicate that Sward "tried to 'open her parachutes'" and that they discussed her options, including filing a grievance, filing an EEOC charge "as a woman and over 40," seeing an attorney, negotiating for eight more months of employment in return for resigning without incident, and leveraging her nearly 30 years of employment and

knowledge of UAMS accounting structures and systems to find other projects to work on for eight months.  Document #36-9.  Assuming that Sward told Baggett that she should sue, however, that statement is not direct evidence of sex discrimination.  Direct evidence is "evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action."  *Russell v. City of Kansas City, Mo.*, 414 F.3d 863, 866 (8th Cir. 2005) (quotation and citation omitted).  Sward was not a decisionmaker in Baggett's case, and direct evidence does not include statements by nondecisionmakers.  *Floyd-Gimon*, 716 F.3d at 1149.

Absent direct evidence of discrimination, the Court must analyze Title VII sex discrimination claims under the *McDonnell Douglas* burden-shifting framework.  *Norman v. Union Pac. R.R. Co.*, 606 F.3d 455, 459 (8th Cir. 2010) (citing *McDonnell Douglas Corp.*, 411 U.S. at 802-04, 93 S. Ct. at 1824-26).  Under that framework, Baggett must first establish a prima facie case that she: (1) is a member of a protected class; (2) was qualified for her job; (3) suffered an adverse employment action that affected a term or condition of her employment; and (4) alleged facts that give rise to an inference of sex discrimination.  *Id.* at 460-61.  Baggett "can satisfy the fourth part of the prima facie case in a variety of ways, such as by showing more-favorable treatment of similarly-situated employees who are not in the protected class, or biased comments by a decisionmaker."  *Guimaraes v. SuperValu, Inc.*, 674 F.3d 962, 974 (8th Cir. 2012) (quotation and citation omitted).  If Baggett establishes a prima facie case, then the burden shifts to the defendants to articulate a nondiscriminatory reason for the adverse action.  *See Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 792 (8th Cir. 2011).  And if the defendants meet this burden, Baggett must show that the defendants' proffered reason is merely a pretext for discrimination.  *See id.*

The parties do not dispute the first three elements of Baggett's prima facie case for her sex discrimination claims.  In particular, the parties do not discuss the third element of Baggett's wage-discrimination claim, and so they do not characterize the precise nature of the adverse employment action that Baggett suffered.  But how that adverse employment action is characterized is relevant to the success or failure of Baggett's ability to establish the fourth element of her prima facie case for her wage-discrimination claim.  Although the briefs are not clear on this point, Baggett may be contending that Barnett's requiring her to return to driving into work five days a week without raising her salary was an adverse employment action motivated by sex discrimination.  She certainly does contend that termination of her employment was an act of sex discrimination.  In addition, Baggett contends that she was paid less than similarly-situated male employees.

Assuming that Baggett contends that Barnett's requiring her to return to work five days per week with no increase in salary was unlawful sex discrimination, her claim on that point fails.  Barnett was in a position to require Baggett to return to driving into work five days a week only because of Baggett's peculiar work arrangement under McKay.  In 2003, McKay accommodated Baggett's request to go to an 80% schedule, and he allowed her to work from home one day each week.  McKay lowered her salary by 20% but kept her listed in the payroll and benefits system at 100% time.  Thus, in 2003 Baggett essentially took a 20% salary cut in order to work from home one day a week.  Beginning in November 2010, Barnett required Baggett to drive in to work five days a week without a salary increase.  Baggett's work situation continued in this manner until April 27, 2011, when Baggett received back pay for the previous five months.  The Court will assume, without deciding, that this circumstance was an adverse employment action.

To meet the fourth element of the prima facie case for her sex-discrimination claims, Baggett points to what she argues is more favorable treatment of a similarly-situated male employee. A comparator must be "similarly situated in all relevant respects," and "the relevant respects are the conduct of the employees and any disparity in their discipline." *Chappell v. Bilco Co.*, 675 F.3d 1110, 1118-19 (8th Cir. 2012). Legate, a man, was hired as a division-level administrator in the cardiology division in March 2011.[2] Baggett maintains that Legate was similarly situated to her, that he had no relevant experience when he was hired, and that his salary was significantly higher than hers.

The defendants argue that Legate is not similarly situated to Baggett. The defendants offer Baggett's deposition testimony, in which she acknowledged that the division of cardiology, into which Legate was hired as a division-level administrator, is one of the largest divisions in the Department of Internal Medicine. Baggett acknowledged that Legate was "responsible for over 30 physicians" and that he reported to a faculty supervisor. Document #21-1 at dep. pp. 51-52. The defendants argue that Baggett, on the other hand, was a department-level associate administrator of accounting who was responsible for only two administrative employees and reported to the administrator of the department. The defendants also offer the affidavit of Holland, the department-level associate administrator of human resources, which states, in pertinent part,

> there are no other employees in the Department of Internal Medicine with an equivalent position to Mrs. Baggett. There is one similar position classified in the accounting system that has the same functional title as Mrs. Baggett-Bettye Bryles, the billing department manager. However, she has 8 direct reports and Mrs. Baggett only had 2. Mrs. Bryles is also a woman . . . .

---

[2] Baggett also identified Brian Carpenter, the administrator of the division of general medicine and an individual with the name of Martin as men who had received more favorable treatment than she had. *See* Document #21-1 at 18 dep. pp. 66-67; *id.* at 40. However, Baggett's brief does not argue that these individuals are similarly situated for purposes of her sex-discrimination claims.

Document #21-4 at 2 ¶ 9.  Finally, the defendants offer the affidavit of Connie Marendt, the

administrator for the division of hematology/oncology.  Marendt's affidavit states, in pertinent part,

> The work that Pam [Baggett] did was not equal to the academic administrators.  Our responsibilities were much greater than hers.  We are responsible for academic practice management.  We supervise faculty, fellows, and staff.  We are responsible for recruiting faculty members, overseeing research compliance and managing clinical trials.  The biggest responsibility we have is planning and staying within budgetary guidelines.  Pam was not responsible for any of this.  She was not responsible for any division in the Department of Internal Medicine.  She was [an] accountant.

Document #21-7 at 1-2 ¶ 6.  Baggett testified that she did not supervise and faculty or fellows, was

not involved in recruiting faculty members, overseeing research compliance or managing clinical trials.

Document #21-1 at dep. pp. 20, 22-23.  She testified that she served primarily a bookkeeping function,

*id.* at dep. p. 24, and the extensive description of her job duties in her brief corroborates that she

served primarily as an accountant.  *See* Document #38 at 2-6.

The facts do not support a finding that Baggett was similarly situated to Legate.  Legate did

not have a prior arrangement to work from home one day a week.  Consequently, Baggett's attempt

to contrast her position with Legate's is an apples-to-oranges comparison.  Legate's hiring and salary

are not circumstances that show a disparity in treatment giving rise to an inference that the defendants'

actions toward Baggett were a result of sex discrimination.

Even if Baggett could show a prima facie case, she cannot establish that the defendants'

proffered nondiscriminatory reasons for the adverse employment actions are mere pretexts for sex

discrimination.  First, Baggett's work arrangement under McKay violated UAMS policies, as Baggett

implicitly recognized by stating that she would be glad to pay back the value of 20% of the full-time

benefits she had enjoyed for the previous seven years in order to clear her good name.  Document #21-

1 at dep. p. 32.  Because of UAMS's complex and differentiated structure, Barnett did not have the

necessary knowledge to determine the value of the benefits Baggett had received over those seven years or how much Baggett might owe to the Department of Internal Medicine.  Nor did Barnett have the power to increase Baggett's salary.  On December 10, 2010, Barnett advised Baggett that the only mechanism he knew of for increasing her salary was an out-of-cycle request based on a position reclassification but that he believed that Baggett's responsibilities could not justify an increase in position level.  When Baggett protested, Barnett treated her response as an appeal, and he involved the human resources department in the matter.  Uncertainty remained regarding how much Baggett might need to pay back, as indicated by Barnett's advising Sward on December 28, 2010 that his expertise would be required to determine what benefits expenses Baggett owed to the department. While it is not clear what efforts the defendants made to resolve these issues between December 28, 2010, and Baggett's meeting with Sward on April 6, 2011, Baggett has not met her burden of showing that the defendants' reasons for the lack of an increase in her salary were a mere pretext for sex discrimination under Title VII or section 1983.

Eliminating Baggett's position certainly was an adverse employment action.  The defendants argue that Baggett's position was eliminated to improve efficiency and eliminate duplication of effort. The defendants maintain that Baggett's position, which involved supervising only two employees, created unnecessary administrative overhead expense.  The defendants point to the affidavits of Whaley and Hummel, the two employees Baggett supervised.  Whaley's affidavit states, in pertinent part,

> 3.     Most administrators preferred to work around [Baggett] and go to either me or Joyce Hummel, not only because of the way [Baggett] treated them, but also because she was not at work very often.  She was only scheduled to work 4 days a week, but [she] often came in less than that.

> 4.     Even before her position was eliminated, she had already assigned most of her responsibilities away to Joyce.  She delegated herself out of a job.  The remaining duties were either taken on by her supervisor, Brian Barnett, or were absorbed by the divisions.  I believe the change has improved efficiency and eliminated work that was already being done by the academic administrators.  Honestly, now that Pam is gone, I'm not real sure I can tell you what she was actually doing in her position other than supervising us on a part-time basis.

Document #21-6 at 1.  Hummel's affidavit contains substantially similar statements.  *See* Document #21-5 at 1-2.  In particular, Hummel states that Baggett "delegated so much of her job out that she wasn't really needed anymore.  I was not surprised when her position was eliminated."  *Id.* at 1 ¶ 3.  Baggett stated in her deposition testimony that Whaley and Hummel were honest people, that they would have no reason to fabricate facts about her position, and that they would be able to give great insight as to whether the elimination of her position improved efficiency or eliminated duplication of functions.  Document #21-1 at 21 dep. p. 79.

Although Baggett disagrees with the testimony of these witnesses, she has not come forward with competent evidence to rebut it.  Consequently, Baggett has not meet her burden of showing that the defendants' reasons for eliminating her position were a mere pretext for sex discrimination under Title VII or section 1983.  Moreover, regarding Baggett's official-capacity section 1983 sex-discrimination claims, Baggett has failed to make the required showing that any of the defendants took action pursuant to an unconstitutional governmental policy or custom or used authority in an unconstitutional manner.  *See Nix*, 879 F.2d at 433.

Title VII wage discrimination claims may also be established using the Equal Pay Act framework.  *See Horn v. Univ. of Minn.*, 362 F.3d 1042, 1045 (8th Cir. 2004); *Tenkku v. Normandy Bank*, 348 F.3d 737, 741 (8th Cir. 2003); *Orahood v. Bd. of Trustees of Univ. of Ark.*, 645 F.2d 651, 654 n.3 (8th Cir. 1981).  The Equal Pay Act is a strict liability statute that prohibits discrimination in

wages on the basis of sex even where there is no showing of discriminatory intent. *Bauer v. Curators of Univ. of Mo.*, 680 F.3d 1043, 1045 (8th Cir. 2012); 29 U.S.C. § 206(d).

> A plaintiff must first establish a prima facie case that women were paid less than men in the same establishment for equal work requiring equal skill, effort, and responsibility and performed under similar working conditions. *Hutchins v. Int'l Bhd. of Teamsters,* 177 F.3d 1076, 1080 (8th Cir. 1999). If a plaintiff establishes a prima facie case, the burden then shifts to the defendant to prove one of four statutory affirmative defenses. *Id.* at 1081. Those defenses require an employer to prove that any wage differential is explained by "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1). In an EPA case, "a defendant cannot escape liability merely by articulating a legitimate non-discriminatory reason for the employment action . . . . [it] must prove that the pay differential was based on a factor other than sex." *Taylor [v. White]*, 321 F.3d [710,] 716 [(8th Cir. 2003)].

*Price v. N. States Power Co.*, 664 F.3d 1186, 1191 (8th Cir. 2011) (first and second alterations in *Price*).

> Whether two jobs entail equal skill, equal effort, or equal responsibility requires a practical judgment on the basis of all the facts and circumstances of a particular case. Skill includes such considerations as experience, training, education, and ability. Effort refers to the physical or mental exertion necessary to the performance of a job. Responsibility concerns the degree of accountability required in performing a job. Application of the Equal Pay Act depends not on job titles or classifications but on the actual requirements and performance of the job. In all cases, therefore, a court must compare the jobs in question in light of the full factual situation and the broad remedial purpose of the statute.

*Simpson v. Merchants & Planters Bank*, 441 F.3d 572, 578 (8th Cir. 2006) (quoting *EEOC v. Universal Underwriters Ins. Co.,* 653 F.2d 1243, 1245 (8th Cir. 1981)). Jobs need not be identical to be considered "equal" under the EPA; they need only be substantially equal. *Id.* at 578 (quotation and citation omitted).

Baggett argues that Legate's job was substantially equal to hers. She contends that both positions are office jobs in the Department of Internal Medicine that involve dealing with a number

of budgeting issues and handling considerable paperwork and personal interaction with a number of different people.

This case is similar to *Orahood*, 645 F.2d 651.  In that case, the plaintiff, Orahood, was hired in 1963 as a secretary by the University of Arkansas at Little Rock.  *Id.* at 653.  Orahood held various positions over the years, including Assistant to the Registrar, Research Associate, and finally, Research Project Analyst—the "number two" position in the Office of Institutional Studies.  *Id.*  The Director of Administrative Services twice indicated that Orahood was the informal acting director of the Office of Institutional Studies while the top position was vacant, and in 1977, he approved Orahood's use of the unofficial working title of "Assistant Director of Institutional Studies."  *Id.*  In 1978, "Orahood requested a change in the status of her job position and an increase in salary. A job status 'reclassification' was necessary for a salary increase because Orahood was earning the maximum salary for someone with her job title."  *Id.*  The Director of the Office of Institutional Studies "recommended a change in job status and increase in salary," and the Director of Administrative Services concurred. *Id.*  However, the Chancellor did not approve a change in status and salary at that time.  *Id.*  Orahood filed a grievance with the Faculty-Staff Appeals Committee, which recommended that her salary be increased, that she receive a new job title, and that she receive back pay for the five-month period from November 1977 to April 1978, during which time she served as acting director of the Office of Institutional Studies.  *Id.* at 654.  In response, the Chancellor "requested that the Arkansas Department of Higher Education conduct a 'job audit' of Orahood's employment position.  This state agency's response was that the position was properly classified.  There was no reclassification of Orahood's position."  *Id.*  Orahood filed suit, alleging discrimination on the basis of sex in violation of the Equal Pay Act and Title VII.  *Id.* at 653.

In support of her equal pay claim, Orahood compare[d] her wages and job to that of a male employee, Ed Kremers, whose job title [was] Assistant Controller in the Controller's Office at UALR. There [was] no dispute that Kremers and Orahood . . . received substantially different salaries over the relevant period. During 1979-80, Kremers was classified at a Grade 20 with a salary of $20,462, while Orahood was classified at a Grade 18 with a salary of $14,404.

*Id.* at 654.

The district court first observed the similarities between the positions of Orahood and Kremers:

(1) both the Office of Institutional Studies and the Controller's Office are administrative, rather than academic, offices of UALR: (2) both the plaintiff and Kremers hold the number two positions in their departments; (3) both employees coordinate, supervise and review the work of lower level employees; (4) both assist in the development of policies and procedures in the departments; (5) both coordinate department needs with computer systems; (6) both are responsible for preparing reports; and (7) both deal with other university and governmental agencies in behalf of their departments.

Orahood v. Board of Trustees, No. LR C 78 457, slip op. at 5 (E.D. Ark. April 16, 1980).

The district court then examined the content of the jobs and found that they could not be equated. It found the Controller's Office to be much larger than the Office of Institutional Studies, and that Kremers had many more employees to supervise than did Orahood. The district court determined Kremers' position required knowledge and work in financial and accounting matters, while Orahood's position dealt with statistics and supplying these materials to university and government agencies as requested. It noted that Kremers' position required a bachelor's degree in accounting or a related field and four years experience, while Orahood's position required a baccalaureate degree in statistics or a related field and two years experience. Kremers had been given the authority to hire and fire, while Orahood had only input into these decisions.

*Id.* at 654-55. The Eighth Circuit affirmed, stating that even though the district court "had before it substantial . . . evidence that the jobs were substantially equal," there was substantial evidence "that the jobs were not substantially equivalent" and that "the differences in the jobs [were] more than inconsequential." *Id.* at 655. See also *Horn*, 362 F.3d at 1045-46 (8th Cir. 2004) (holding that

university assistant coaching positions with identical contracts and job descriptions were not substantially equivalent for purposes of the Equal Pay Act and Title VII even though the coaches expended equal amounts of time and effort in fulfilling their duties, where the day-to-day responsibilities of one position involved recruiting and public-relations skills and experience but the other involved more "behind the scenes" work).

Here, viewing the evidence in the light most favorable to Baggett, and accepting Baggett's argument that her and Legate's positions were both office jobs in the Department of Internal Medicine that involved dealing with a number of budgeting issues, handling considerable paperwork, and personally interacting with a number of different people, the jobs are not substantially equivalent. Baggett acknowledged in deposition testimony that Legate was "responsible for over 30 physicians" and that he reported to a faculty supervisor. Document #21-1 at dep. pp. 51-52. Baggett, on the other hand, was a department-level associate administrator of accounting who was responsible for only two administrative employees and reported to the administrator of the department. Furthermore, the undisputed evidence indicates that division-level administrators' responsibilities include supervising faculty and fellows, recruiting faculty members, overseeing research compliance, managing clinical trials, and planning division expenditures within budgetary guidelines. Documents #21-1 at dep. pp. 20, 22-23, #21-7 at 1-2 ¶ 6. Baggett's position did not place these responsibilities on her shoulders. Rather, Baggett served primarily a bookkeeping function. These differences in Baggett's and Legate's positions are "more than inconsequential." *See Orahood*, 645 F.2d at 655.

The other department-level associate administrators in the Department of Internal Medicine received salaries that were roughly similar to the $66.995.00 per year that Baggett claims she should have received. Baggett submitted a document showing fiscal year 2010-2011 salaries. That document

shows Bryles, the associate administrator for billing, with a salary of $64,966.00 per year and Holland, the associate administrator for human resources, with a salary of $68,113.00.[3]  Document #36-6.  Like Baggett, Holland and Bryles had been employed by the Department of Internal Medicine for many years.  Baggett also argues that another woman, Phyllis Milne, was newly hired as an associate administrator of clinical trials with a salary of $66,000.00.  Document #37 at 14 ¶ 40 resp.  Even if these department-level associate administrators' positions were substantially equal to Baggett's position, that would not support her Equal Pay Act claim because these positions were all held by women.  Consequently, Baggett has failed to establish a "prima facie case that women were paid less than men in the same establishment for equal work." *Price*, 664 F.3d at 1191.[4]

In sum, Baggett has failed to meet her burdens of establishing a claim of sex discrimination under Title VII, section 1983, or the Equal Pay Act.

**B.     Retaliation Claims**

Baggett has alleged claims for retaliation under Title VII and section 1983.  For her section 1983 claim, Baggett again does not specify which constitutional right she claims the defendants violated.  There is not a clearly established right to be free from retaliation under the Equal Protection Clause.  *Burton v. Ark. Sec'y of State*, No. 13-1427, 2013 WL 6596923, at *13 (8th Cir. Dec. 17, 2013) (slip opinion).  Furthermore, the Eighth Circuit has stated,

> We have previously recognized that "section 704(a) of Title VII 'may not be the basis for a retaliatory discharge claim in a § 1983 action.'"  *Tyler [v. Univ. of Ark. Bd. of Trs.]*, 628 F.3d [980], 986 [(8th Cir. 2011)] (quoting *Greenwood v. Ross*, 778 F.2d 448, 455 (8th Cir. 1985)).  However, "§ 1983 provides a vehicle for redressing claims

---

[3] Baggett's brief states that Holland's salary was $66,000.00.  Documents #37 at 14 ¶ 40 resp., #38 at 10.

[4] The defendants do not attempt to argue any of the four statutory affirmative defenses under the Equal Pay Act.  *See* 29 U.S.C. § 206(d)(1).

of retaliation *on the basis of the First Amendment.*"  *Id.*  (emphasis added) (citing
*Lewis v. Jacks*, 486 F.3d 1025, 1028-29 (8th Cir. 2007)).

*Id.* at *12.  Consequently, this Court will infer that Baggett intended her section 1983 retaliation claim

to allege a violation of her First Amendment rights.

"First Amendment retaliation claims are analyzed under the same framework as claims of

retaliation under Title VII."  *Okruhlik v. Univ. of Ark.,* 395 F.3d 872, 878 (8th Cir. 2005).  Again, the

*McDonnell Douglas* burden-shifting framework applies.  "To state a retaliation claim, consisting of

the same elements under Title VII and the First Amendment, a plaintiff must prove that: (1) she

engaged in a protected activity; (2) that the employer took an adverse employment action against her,

and (3) that the two situations are causally connected."  *Id.* (citing *Kipp v. Mo. Highway & Transp.*

*Comm'n.*, 280 F.3d 893, 896 (8th Cir. 2002) (Title VII); *Duffy v. McPhillips,* 276 F.3d 988, 991 (8th

Cir. 2002) (First Amendment)).  The defendants concede the second element, that the elimination of

Baggett's position was an adverse employment action.  But they argue that Baggett's complaints

about being paid a part-time salary for full-time work and her threat to file a charge of discrimination

with the EEOC do not constitute protected activities.  Baggett complained to Bradley, Wood,

Dr. Marsh, and Sward about her salary.  These complaints included a March 18, 2011 email in which

she stated that her salary was not equitable in light of the salaries of other department-level associate

administrators and stated that this situation should be corrected by any means necessary.  Ultimately,

Baggett gave Sward a letter in which she stated that she would file a charge with the Equal

Employment Opportunity Commission if her salary was not corrected.  Baggett also spoke to

Dr. Marsh about her concern that Barnett was not teaching her the necessary skills to succeed in her

position.

"In the First Amendment context, when deciding whether a public employee's speech is protected, the threshold question is whether the employee's speech may be fairly characterized as constituting speech on a matter of public concern." *Hylla v. Transp. Commc'ns Int'l Union*, 536 F.3d 911, 917 (8th Cir. 2008) (quotations, citations, and alterations omitted). "To decide whether speech addressed a matter of public concern, we examine the speech's content, form, and context." *Bauxworth v. Hazelwood Sch. Dist.*, 986 F.2d 1197, 1198 (8th Cir. 1993). "[W]e consider whether the employee attempted to communicate the speech to the public at large and the employee's motivation in speaking." *Id.* at 1198. "Unless the employee is speaking as a concerned citizen, and not just as an employee, the speech does not fall under the protection of the First Amendment." *Buazard v. Meridith*, 172 F.3d 546, 548 (8th Cir. 1999). "When a public employee's speech is purely job-related, that speech will not be deemed a matter of public concern." *Id.* at 548; *see Connick v. Myers*, 461 U.S. 138, 147, 103 S. Ct. 1684, 1690, 75 L. Ed. 2d 708 (1983) (holding that "a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.").

Here, the content of Baggett's speech concerned her salary and her feeling that Barnett was not teaching her the necessary skills to succeed in her position. That speech took the form of emails and letters to her coworkers as well as personal conversations with them. It came in the context of her efforts to have her salary increased. As such, Baggett's speech was "purely job-related." *Buazard*, 172 F.3d at 548. She did not speak "as a concerned citizen, but just as an employee." *Id.* Consequently, her speech did not bear on a matter of public concern and was not protected activity under the First Amendment. Thus, Baggett has failed to meet her burden of showing a prima facie case on her section 1983 retaliation claim. Moreover, regarding Baggett's official-capacity section

1983 retaliation claims, Baggett has failed to make the required showing that any of the defendants took action pursuant to an unconstitutional governmental policy or custom or used authority in an unconstitutional manner.  *See Nix*, 879 F.2d at 433.

To allege that she has engaged in protected activity under Title VII, Baggett must allege that she has "opposed any practice made an unlawful employment practice by [Title VII], or . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]."  42 U.S.C. § 2000e-3(a).  Baggett does not allege that she was retaliated against for participating in an investigation, proceeding, or hearing.  Rather, she claims that on April 6, 2011, she spoke with Sward and gave him a letter stating that she would file a charge with the Equal Employment Opportunity Commission if her salary was not corrected.  There is no evidence to indicate that Baggett opposed or even complained of sex discrimination in violation of Title VII.  To the contrary, the defendants point to affidavits from Bradley, Hummel, Whaley, Marendt, and Holland—five women who worked with both Barnett and Baggett—which state that Baggett never complained that she was discriminated against, unfairly treated, or paid less because she was a woman.  *See* Documents #21-3 at 2 ¶¶ 5, 8; #21-4 at 2 ¶¶ 5, 6, 8; #21-5 at 2 ¶ 6; #21-6 at 2 ¶ 7; and #21-7 at 2 ¶ 8.  Consequently, Baggett has not shown that she engaged in protected activity under Title VII.

Even if Baggett's April 6, 2011 letter were to be construed as protected activity, she cannot show a causal connection between that letter and the elimination of her position.  Establishing causation requires showing that "the desire to retaliate was the but for cause of her termination."  *Wright v. St. Vincent Health Sys.*, 730 F.3d 732, 737 (8th Cir. 2013) (quotation and citation omitted).  Baggett would have to show that "the protected conduct was a 'determinative—not merely a motivating—factor' in the employer's adverse employment decision."  *Id.* at 738 (quoting *Carrington*

*v. City of Des Moines, Iowa,* 481 F.3d 1046, 1053 (8th Cir. 2007)).  The evidence shows that, other

than the termination date, the termination letter Baggett received on April 28, 2011, was identical to

the March 31, 2010 letter that had been approved by the UAMS Office of General Counsel on April 1,

2010.  The fact that the termination letter was drafted and approved by legal counsel five days before

Baggett gave her letter to Sward is sufficient to show that Baggett's threat to go to the EEOC was

not a "but for" or "determinative cause" of her termination.  *See Kobrin v. Univ. of Minn.*, 34 F.3d

698, 704 (8th Cir. 1994) ("Because the termination date of June 1990 was established before she filed

her discrimination claim, Kobrin cannot show the causal connection element of the prima facie case

as to the termination of her position.").

Finally, even if Baggett could show a prima facie case of retaliation, she could not show that

the defendants' legitimate, nondiscriminatory reason for eliminating her position is a mere pretext for

retaliation for the same reasons as were discussed in the analysis of Baggett's sex-discrimination claim

in section III.A, *supra*.

## C.      Qualified Immunity

The defendants argue that Baggett's individual-capacity section 1983 claims against Barnett

are barred by qualified immunity.

> In a § 1983 action, qualified immunity shields a government official from liability
> "unless his conduct violates 'clearly established statutory or constitutional rights of
> which a reasonable person would have known.'" *Loch v. City of Litchfield,* 689 F.3d
> 961, 965 (8th Cir. 2012) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S. Ct.
> 2727, 73 L. Ed. 2d 396 (1982)).  "When a defendant asserts qualified immunity at the
> summary judgment stage, the plaintiff must produce evidence sufficient to create a
> genuine issue of fact regarding whether the defendant violated a clearly established
> right."  *Bishop v. Glazier,* 723 F.3d 957, 961 (8th Cir. 2013).

*Coker v. Ark. State Police*, 734 F.3d 838, 841-42 (8th Cir. 2013).  As discussed *supra*, Baggett has

not produced evidence sufficient to create a genuine issue whether Barnett violated a clearly

established right.  *A fortiori*, Barnett did not violate a clearly established right of which a reasonable person would have known.  Consequently, Baggett's individual-capacity section 1983 claims against Barnett are also barred by qualified immunity.

## CONCLUSION

Pam Baggett makes a case for the proposition that she was treated unfairly (though UAMS certainly presents evidence to the contrary).  Baggett does not, however, present evidence to show that she suffered an adverse employment action because of her sex, or that she was paid less than men with comparable duties.  Nor does she present evidence sufficient to show that she was terminated in retaliation for exercising her constitutional rights or her rights under Title VII.  The defendants' motion for summary judgment is granted.  Document #21.

IT IS SO ORDERED this 7th day of January, 2014.

_____
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE